FILED

2020 May-05  PM 02:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA**

| | |
|---|---|
| WILLIAM JAMES GRIFFIN and ASHLEY LAWLEY, on behalf of themselves and others similarly situated, | ) ) ) ) ) CLASS ACTION COMPLAINT |
| Plaintiff, | ) |
| v. | ) Case No. |
| BENEFYTT TECHNOLOGIES, INC. (f/k/a HEALTH INSURANCE INNOVATIONS, INC.), and HEALTH PLAN INTERMEDIARIES HOLDINGS, INC., | ) ) ) DEMAND FOR JURY TRIAL |
| Defendants. | ) |

1.      Defendants Benefytt Technologies, Inc. (formerly known as Health Insurance Innovations, Inc.) and Health Plan Intermediaries Holdings, Inc. (collectively "HII") (collectively, "HII" or "Defendants") have unscrupulously targeted and exploited vulnerable consumers searching for comprehensive medical insurance. While Defendants marketed their policies as comprehensive medical insurance, the policies were instead limited benefit non-ACA compliant health plans that were marketed along with largely bogus add-on products like discount cards, association memberships and accidental health insurance to make them seem more

comprehensive than they were in reality. The policies left patients with little or no insurance for comprehensive care, excluding coverage for preexisting conditions and prescription drugs and imposing very low dollar limits on other services.

2.     As the FTC noted in its action against one of HII's co-conspirators Simple Health, "Deceived consumers are effectively left uninsured and subjected to nearly unlimited financial exposure." *FTC v. Simple Health Plans, LLC*, Memorandum in Support of Plaintiff's Motion for *Ex Parte* Temporary Restraining Order at 1. From the beginning of the scheme, the actions of Defendants and their co-conspirators were unconscionable and detrimental. Now, in the midst of a pandemic, Plaintiffs and Class Members who thought they had purchased comprehensive medical insurance, will not have plans that cover their treatment should they become infected. Accordingly, the harm to Plaintiffs and Class Members is potentially catastrophic and possibly even fatal.

3.     Even prior to the current pandemic, the FTC had brought an action against Simple Health calling the practices at issue here a "classic bait-and-switch scheme." *FTC v. Simple Health Plans, LLC*, Memorandum in Support of Plaintiff's Motion for *Ex Parte* Temporary Restraining Order at 2. In granting the FTC's motion for preliminary injunction on May 14, 2019, the Court concluded, "Though consumers believed they were purchasing comprehensive health insurance coverage, [Simple Health] sold them practically worthless limited indemnity or discount

plans." However, HII's conspiracy and scheme includes third parties other than Simple Health including Assurance IQ, Inc., ("Assurance") and Nationwide Health Advisors ("Nationwide").

4.      Plaintiffs, who are among the victims of Defendants' uniform scheme, bring this action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, on behalf of themselves and a class of similarly situated consumers seeking redress for the illegal acts of the Defendants which have resulted in a loss of their property, and for declaratory and injunctive relief to prevent further losses.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. §§ 1961, 1962, 1964 and 28 U.S.C. §§ 1331 and 1367.  The Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(b) and (d) because the Defendants transact business in this District. This Court also has personal jurisdiction under the conspiracy theory of jurisdiction under Alabama law because Defendants participated in a conspiracy in which at least one conspirator committed overt acts in Alabama in furtherance of the conspiracy, *J&M Assocs. v. Callahan*, No. 07-0883-CG-C, 2011 U.S. Dist. LEXIS 131752, at *11 (S.D. Ala. Nov. 15, 2011), and under Alabama's long-arm statute, Ala. R. Civ. P. 4.2(b), because Defendants' advertisements, marketing, sales, issuance of policies

and collection of payments in Alabama constitute minimum contacts with Alabama, and the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.

6.     Venue is proper in this district pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) because Defendants transact business in this District, and because a significant part of the events, acts and omissions giving rise to this action occurred in the District.

## **PARTIES**

**Plaintiffs:**

7.     Plaintiff William James Griffin is an adult resident of Blount County, Alabama.  Mr. Griffin purchased an American Financial Security Life Insurance Company limited benefits product which Defendants called their Health Choice + Plan and memberships with the "National Congress of Employers," the "Med-Sense Guaranteed Association," PEP (an "online health and wellness program"), ScripPal (a pharmacy discount card), RxHelpline (purporting to be "a prescription savings program"), and Teladoc. Defendants also included a "voluntary accident insurance" policy from Federal Insurance Company. Plaintiff Griffin did not receive a comprehensive medical plan as represented. Upon information and belief, Mr. Griffin's "benefits package" was marketed through Simple Health.

8.    Plaintiff Ashley Lawley is a resident of Jefferson County, Alabama. Rather than a comprehensive medical plan, Defendants sold Ms. Lawley a limited benefit short term health insurance product entitled Advant Health STM from American Financial packaged together with other products and discount clubs, including memberships with the "National Congress of Employers," "The Alliance for Consumers USA, Inc.," the "Med-Sense Guaranteed Association," PEP (an "online health and wellness program"), ScripPal (a pharmacy discount card), RxHelpline (purporting to be "a prescription savings program"), and Teladoc. Defendants also sold her Group Critical Condition Insurance from Federal Insurance Company. Upon information and belief, Ms. Lawley's "benefits package" was marketed through Simple Health.

**Defendants:**

9.    Defendant Benefytt Technologies, Inc. ("BTI"), formerly known as Health Insurance Innovations, Inc., is a Delaware corporation with its corporate headquarters located in Tampa, Florida. Health Insurance Innovations, Inc.'s common stock was traded under the ticker symbol "HIIQ."  HIIQ was a holding company whose only material asset is ownership of a 100% economic interest in Defendant Health Plan Intermediaries Holdings, Inc. ("HPIH"), in which HIIQ was the sole member.  In addition, HIIQ had 100% of the voting rights and control over HPIH. Following regulatory attention and a subsequent stock price drop, on March

6, HIIQ announced that it had been officially renamed Benefytt Technologies, Inc. with the ticker symbol "BFYT." Going forward, however, the re-named company will continue to offer "health insurance and supplemental products" utilizing "private e-commerce health insurance marketplaces, consumer engagement platforms, agency technology systems, and insurance policy administration platforms."  March 6, 2020 Press Release found at www.investor.benefytt.com.

10.    Defendant Health Plan Intermediaries Holdings Inc. ("HPIH") is a Delaware limited liability company based in Tampa, Florida.

11.    BTI and HPIH are jointly referred to herein as "HII."

**Co-Conspirators Not Named as Defendants:**

12.    Assurance IQ, Inc. ("Assurance") is a Washington corporation with is principal place of business in Bellevue, Washington.  According to its website, launched in 2016 in Bellevue, Washington, Assurance was founded to improve the personal and financial health of every consumer and make their lives better. The company uses advanced data analytics to enable an extensive network of live agents to offer customized solutions for more people across a broader socio-economic spectrum.  On October 10, 2019, Assurance was purchased by Prudential, Inc for $2.35 billion.

13.    Simple Health Plans LLC, Health Benefits One LLC, Health Center Management LLC, Innovative Customer Care LLC (a Florida limited liability

company with its principal place of business in Hollywood, Florida), Simple Insurance Leads LLC, and Senior Benefits One (collectively, "Simple Health") are all Florida limited liability companies with their principal place in Hollywood, Florida. Simple Health advertised, marketed distributed, or sold limited benefit plans and medical discount memberships to consumers throughout the United States on HII's behalf.  Products sold by Simple Health included Principle Advantage, Legion Limited Medical, Unified Health One, Health Choice, Advant Health STM and Protector 360.  These products were underwritten by companies such as Companion Life Insurance, Axis Insurance Co., Unified Life Ins. Co., American Financial Security Life Ins. Co. and Humana Insurance Company.

14.     Donisi Jax, Inc. d/b/a Nationwide Health ("Nationwide") is a Florida corporation headquartered in Pompano Beach, Florida. Upon information and belief, Nationwide marketed and sold the Cardinal Choice limited benefit indemnity product for Defendants.

15.     Assurance, Simple Health and Nationwide were not the only distributors included in HII's scheme, enterprise and conspiracy. However, discovery will be necessary to identify the other entities

## FACTUAL ALLEGATIONS

**HII and HII's Distribution Network**:

16.     In its 2015 10-K, HII described itself as "a developer, distributor and virtual administrator of…health insurance plans and supplemental products", "includ[ing] short-term medical…insurance plans and hospital indemnity plans."

17.     HII's health insurance plans are not comprehensive health insurance plans and do not comply with the ACA. The advantages of ACA-compliant policies include coverage of preexisting conditions as well "essential health benefits," including emergency medical care, hospitalization, prescription medication, preventative care, mental health benefits, maternity care, and pediatric care.

18.     Unlike comprehensive health insurance plans, HII's health insurance plans do not cover pre-existing conditions, do not have networks of healthcare providers that have agreed to their price schedules, do not provide mental health benefits, maternity benefits, or other essential health benefits. However, they DO contain restrictive limits on both individual benefits and the total amount of benefits provided. These characteristics combine to leave insureds and their family members owing catastrophic health benefits at a time when they are most vulnerable.

19.     As noted in HII's 2015 10-K, HII also "offer[s] a variety of additional insurance and non-insurance products such as pharmacy benefit cards, dental plans, vision plans, cancer/critical illness plans, deductible and gap protection plans and life insurance policies that are frequently purchases as supplements to the" insurance plans.

20.    The supplemental products that were packaged with HII's health insurance plans were medical discount plans or association memberships, providing little if any medical benefits. However, HII packages these products along with their limited benefit medical plans to make these plans appear more comprehensive and to generate additional profits.

21.    While HII sells products other than health insurance plans , in 2018, approximately 45% of HII's revenue resulted from the sale of hospital indemnity plans and approximately 25% resulted from the sale of short term medical insurance plans.

22.    What HII failed to disclose in its regulatory filings is that HII also developed a scheme to market its limited benefit and very limited value indemnity plans and association memberships as comprehensive health insurance in order to exact inflated prices and convince consumers that they were buying traditional health insurance.

23.    In order to implement this scheme, beginning in 2013, HII recruited and conspired with distributors including Assurance, Simple Health, Nationwide, and others to market these limited benefit non-ACA compliant insurance policies, discount cards, association memberships and accidental health insurance as comprehensive health insurance. Assurance, Simple Health and Nationwide

solicited sales, took applications, issued coverage and collected the initial premiums through an internet portal.

24.     HII provides Assurance, Simple Health and Nationwide "training, audit and other support, and monitoring." HII 2018 10-K at 7.

25.     HII also "make[s] advance commission payments…in order to assist them with the cost of lead acquisition and provide working capital." HII 2018 10-K at 18, 47.

26.     HII "collects premium equivalents upon the initial sale of the plan and then monthly upon each subsequent periodic payment under such plan," primarily "through online credit care or ACH processing." HII 2018 10-K at 63. HII then remits payments to Simple Health, Nationwide, and Assurance. *Id.*

27.     Following sale of a plan, HII also provides customer support that HII refers to as "member management." HII 2018 10-K at 75. Member management includes "billing, collection, and member support… processing enrollment forms for the member's insurance or discount benefit plan, verifying eligibility for coverage, providing fulfillment documents to members, member support calls, and other support activities." *Id.*

28.     The relationship between HII, Assurance, Simple Health and Nationwide was not arms-length but instead constituted an enterprise formed for the mutual benefit of all parties and at the expense of defrauded consumers. For

example, HII participated in, directed, and fostered the enterprise and the mail and wire fraud in at least the following ways:

(a)    developing the products at the heart of the scheme;

(b)    developing the network and recruiting Assurance, Simple Health and Nationwide;

(c)    entering into an exclusive agreement in 2013 with Assurance, Simple Health for the promotion of HII products – primarily limited benefit indemnity plans, medical discount plans and AD&D insurance;

(d)    entering into a similar agreement with Nationwide in 2015;

(e)    paying Assurance, Simple Health and Nationwide very high commissions;

(f)    funding the operation of Assurance, Simple Health and Nationwide with advanced commissions which basically constituted multi-million dollar loans;

(g)    jointly creating misleading "lead generation" websites;

(h)    providing an online platform for Assurance, Simple Health and Nationwide to quote and sale HII products;

(i)    recruiting and training Assurance, Simple Health and Nationwide sales agents;

(j)     allowing Assurance, Simple Health and Nationwide agents to register their licenses through HII;

(k)     monitoring sales calls;

(l)     reviewing, editing, and approving fraudulent sales scripts;

(m)     acting as third-party administrator, providing customer service after the sale including processing enrollment forms, verification of coverage, and providing documents to consumers;

(n)     collecting premiums;

(o)     accounting for premiums and commissions and distributing commissions to Assurance, Simple Health and Nationwide; and

(p)     fielding consumer complaints.

29.     In fact, when regulatory agencies began investigating Simple Health, HII even paid Simple Health's legal costs.

30.     From 2014 through October 2018, HII paid almost $200 million in commissions to Simple Health.

31.     In October 2018, the FTC filed suit against Simple Health Plans, LLC. The FCC investigation relied on thousands of pages of documents, extensive witness interviews, and call recordings. The United States District Court for the Southern District of Florida granted a temporary restraining order on October 31, 2018 and a

permanent injunction on May 14, 2019, freezing Simple Health Plan's assets, appointing a receiver, and enjoining it from selling policies. The pleadings demonstrated a massive scheme by Simple Health, on behalf of HII, to lure customers into believing they were purchasing comprehensive health insurance.

32.     Prior to the FTC action against Simple Health in 2018, Simple Health was HII's largest distributor. Nationwide was also a significant distributor but since the FTC's action against Simple Health resulted in the dissolution of Simple Health, Nationwide became an even more significant distributor of HII products.

**The Fraudulent Scheme:**

33.     Defendants and their co-conspirators have engaged in a scheme to target consumers seeking comprehensive health insurance.

34.     Sales agents marketed HII products as comparable coverage at lower prices, leading consumers to believe they were receiving comprehensive health insurance. What consumers received, however, were limited benefit non-ACA compliant indemnity insurance, discount memberships and accidental health insurance.

35.     The scheme involved numerous representations regarding the products being offered and omitted material facts regarding the limitations of those products.

36.     HII not only knew about the representations and omissions but was complicit and instrumental in the fraudulent scheme.

37.    HII "regularly provide[s] health insurance plan information in the scripts used by out independent third-party distributors." HII 2018 10-K at 17. As HII admits, "The information we provide on our platform, through our independent third-party distributors, and otherwise may be construed as not accurate or misleading." *Id.* HII also concedes that HII has "received complaints that the information we provided was not accurate or was misleading." *Id.*

38.    As the FTC explained, consumers were (1) "enticed by…misleading search engine and lead generation websites," (2) "subjected to a deceptive telemarketing pitch," and (3) "run through a sham verification process." *FTC v. Simple Health Plans, LLC*, Plaintiffs' Reply Memorandum in Support of a Preliminary Injunction at 4.

39.    HII, Assurance, Simple Health, and Nationwide "utilize keyword search, primarily paid keyword search listings on various online search engines and other forms of internet advertising, to drive internet traffic to the lead aggregator's website." HII 2018 10-K at 9.

40.    Defendants' deceptive search engine advertisements included keywords such as "Obamacare," "AARP," and "BlueCross Blue Shield."

41.    The deceptive lead-generation websites, utilized by HII, Assurance, Simple Health, and Nationwide contained numerous misrepresentations and omissions. The websites typically claimed to provide information about obtaining

14

comprehensive health insurance, including insurance available through the marketplaces established pursuant to the ACA, including addresses such as "Obamacare-healthquotes.com."

42.     The websites suggested the products were affiliated with established carriers such as Blue Cross, Aetna, and Cigna and with associations such as the American Association of Retired Person and included the Better Business Bureau logo. Neither the products nor the companies had any such affiliations or endorsements.

43.     Consumers could contact an agent by calling a toll-free number displayed on the website.

44.     The websites also suggested that consumers who provided their contact information would receive multiple quotes for comprehensive insurance coverage.

45.     Consumers who submitted their contact information to one of the lead generation websites subsequently received a call from a sales agent.

46.     The call centers utilized uniform and deceptive scripts to assure consumers they were only being offered comprehensive, ACA-compliant health care plans.

47.     As the FTC stated, the script "is deceptive on its face." *FTC v. Simple Health Plans, LLC*, Memorandum in Support of Plaintiff's Motion for *Ex Parte* Temporary Restraining Order at 12. Moreover, as the FTC concluded, "The intent

of the scripts is unmistakable – to leave consumers with the impression that they were purchasing comprehensive health insurance or its equivalent." *FTC v. Simple Health Plans, LLC*, Plaintiffs' Reply Memorandum in Support of a Preliminary Injunction at 7.

48.     The FTC noted that sales agents were required to strictly adhere to the script or risk termination.

49.     The sales scripts began with a "Fear of God" section which was intended to create a sense of urgency and fear regarding whether they would qualify for the insurance being offered. The script referred to helping find "an affordable health insurance quote."  The sales agents would claim to search from "MAJOR 'A rated' CARRIERS" to find the "BEST PLAN out there for the BEST PRICE."  The telemarketer would warn that it was possible the consumer would not qualify for any plans. However, despite placing the consumer on hold while allegedly searching for comprehensive health coverage, the telemarketer did not conduct any searches but instead offered only a limited indemnity plan and other non-insurance products.

50.     The script next directed the telemarketer to refer to the products being offered using phrases such as "health insurance plan," "medical insurance package," and "PPO."  But the plans were neither comprehensive nor PPO's. The telemarketer also misleadingly talked about the coverage being offered using phrases such as "prescription drug plan," "doctor office visits," "diagnostic testing," and "hospital

coverage." The scripts also stated that coverage would not be denied as a result of pre-existing conditions but would pay immediately. Yet, the plans contained a one-year pre-existing condition exclusion.

51.    Pursuant to the script, consumers were also told they could use their insurance to see almost any doctor in the country or to use any facility. This was not true. The plans, of course, were not comprehensive medical insurance.

52.    The scripts represented that consumers would pay very little, if anything, for healthcare and prescriptions. However, the plans, at most, paid only very limited benefits leaving the consumer to pay the overwhelming majority of the costs of healthcare.

53.    HII's limited benefit and short-term plans are not comprehensive health insurance, are not ACA-compliant and do not provide the benefits promised in the telemarketer's sales pitch.

54.    Not only did the scripts contain knowingly false information, they failed to disclose material facts including, *inter alia*, the following: (1) the products were not comprehensive health insurance but were instead limited benefit plans and medical discount memberships; (2) the products did not comply with the ACA and, accordingly, consumers would be subject to the ACA penalty; (3) that, at most, the limited benefits plans provided only extremely limited reimbursements leaving the

consumer responsible for the remainder of the cost; and (4) that the prescription drug plan was simply a savings card.

55.    Assurance and Simple Health used Defendants' web-based payment platform to process payments from consumers.

56.    After securing the sale, the telemarketer explained the consumer would next participate in a verification process. Prior to the verification process, the telemarketer would warn consumers not to ask questions and to disregard any statements that contradicted the telemarketers' statements. The telemarketer falsely explained that the process used a single script but that many of the parts would not apply to the consumer specifically, including statements that the consumer was not buying comprehensive insurance: "Now, they also will tell you that this is not a major medical plan or a discount plan.  Obviously this isn't a discount plan.  This is insurance."

57.    Pursuant to the script, the telemarketers also warned consumers to ignore the statements about pre-existing conditions not being covered, assuring consumers that they had immediate coverage.

58.    The telemarketers suggested that if the consumer asked questions, the process would have to be repeated from the beginning.

59.    Simple Health then utilized a sham "verification" process, utilizing standardized scripts, and turning off the recording should the consumer ask any questions so the misrepresentations could be repeated without creating any evidence.

60.    Nationwide used a similar script and process and similarly represented that consumers were receiving comprehensive medical insurance. Nationwide similarly failed to disclose material facts. Nationwide also used Defendants' web-based payment platform to process payments from consumers.

61.    Assurance, Simple Health and Nationwide, at HII's direction, represented themselves as being committed to acting in Plaintiffs' and Class Members' interest and encouraged consumers to rely on their purported knowledge, independence, and unbiased expertise in procuring insurance coverage. Assurance, Simple Health and Nationwide acted as common law fiduciaries and, accordingly, owed Plaintiffs and Class Members a duty of full and fair disclosure and complete candor with regard to the products offered and a duty of loyalty to act in their best interests.

62.    The fraudulent scheme was undertaken with the specific intent of inducing consumers to purchase Defendants' near-worthless products, believing they were purchasing comprehensive, ADA-compliant health insurance.

63.    Plaintiffs and class members did, in fact, rely on Defendants' misrepresentations and omissions in purchasing the products and in making

payments.  Absent Defendants' standardized misrepresentations and omissions that the products being offered were comprehensive, ADA-compliant health insurance, no Plaintiff or Class Members would have agreed to buy Defendants' valueless products.

**Plaintiffs Were Victims of the Scheme:**

64.    Jim Griffin purchased what he believed to be comprehensive medical insurance coverage from Defendants.

65.    On or about November 1, 2018, Mr. Griffin searched online for health insurance.

66.    His search results led him to a website similar to this one:



67.    After entering information onto the website, Mr. Griffin received a phone call from Defendants' agents who walked him through a script similar to that described above.  He told them that he needed comprehensive health coverage.

68.    Defendants' agent assured him they were selling him a plan that would pay 80% of his medical expenses and would pay defined benefits on top of that. They also informed him that it was major medical coverage that would cover doctor's bills, hospital costs, prescription drugs and similar costs.

69.    In agreeing to purchase the insurance and in continuing to pay the monthly premiums, Mr. Griffin relied on this representation that he was obtaining comprehensive medical insurance.

70.    Mr. Griffin's monthly charges were $689.16, which Defendants electronically debited from Mr. Griffin's checking account.

71.    On May 27, 2019, Mr. Griffin suffered a heart attack that required a stent and four days of hospitalization.  Only after this medical emergency did Mr. Griffin learn the true benefits of the product he purchased and found that he owed $150,000 in medical expenses not covered.

72.    Rather than a comprehensive medical plan, Defendants had sold Mr. Griffin an American Financial Security Life Insurance Company limited benefits product which they called their Health Choice + Plan and memberships with the "National Congress of Employers," the "Med-Sense Guaranteed Association," PEP

(an "online health and wellness program"),  ScripPal (a pharmacy discount card), RxHelpline (purporting to be "a prescription savings program"), and Teladoc. They also included a "voluntary accident insurance" policy from Federal Insurance Company.

73.    Defendants did not pay Mr. Griffin's medical expenses as represented. Even after Defendants' refusal to pay Mr. Griffin's medical expenses as represented, they continued to debit his bank account for payments despite his repeated requests to cancel the insurance and to cease debiting his account.

74.    Plaintiff Ashely Lawley also believed she purchased comprehensive medical insurance coverage from Defendants. In June of 2018 Ms. Lawley searched online for health insurance and was contacted by an agent of HII. Based on the representations of HII's agent, Ms. Lawley believed she was purchasing comprehensive health insurance.

75.    In late October 2018, Ms. Lawley saw her chiropractor and was referred to a surgeon to discuss removal of a suspicious lump on her neck. She immediately called "Justin," an HII agent, to confirm that the appointment and procedure would be covered. Justin informed her that she would need to purchase a "Major Medical" plan and that the lump would not be considered a pre-existing condition. He explained that the plan was comprehensive and would cover eighty percent of her charges for doctor visits, hospital stays, surgeries, and other medical services.

76.    Ms. Lawley agreed to purchase the insurance and paid the monthly premiums in reliance on the representations that she was obtaining comprehensive health insurance.

77.    Defendants charged Ms. Lawley a monthly premium of $273.45, drafted electronically from her checking account.

78.    Following her initial visit with the surgeon, she again confirmed with "Justin" that the procedure would be covered and that she would only need to pay a $500 copay.

79.    Ms. Lawley scheduled surgery to remove a mass on her neck on November 13, 2018. Ms. Lawley paid a co-pay and after more discussions with Justin was told by her doctor's office that the surgery had been pre-approved.

80.    Following the medical procedure, Ms. Lawley learned the true benefits of the product.

81.    For months, she received form after form repeatedly saying that no benefits were being paid. Nearly a year later she was left with $20,000 in uncovered medical expenses. Rather than a comprehensive medical plan, Defendants had sold Ms. Lawley was a short term health insurance product entitled Advant Health STM from American Financial packaged together with other products and discount clubs, including memberships with the "National Congress of Employers," "The Alliance for Consumers USA, Inc.," the "Med-Sense Guaranteed Association," PEP (an

"online health and wellness program"), ScripPal (a pharmacy discount card), RxHelpline (purporting to be "a prescription savings program"), and Teladoc. Defendants also sold her Group Critical Condition Insurance from Federal Insurance Company.

82.     Defendants did not pay Ms. Lawley's medical expenses as represented.

83.     Plaintiffs and Class Members were injured by Defendants' fraudulent scheme and predicate acts. First, Plaintiffs and Class Members purchased insurance and paid fees and premiums they would not have paid absent Defendants' misrepresentations and omissions. Second, Plaintiffs and members of the Subclass were injured because they incurred unreimbursed medical expenses that would have been covered by comprehensive medical insurance.

## RICO ALLEGATIONS

84.     Plaintiffs, the class members and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

85.     Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that Plaintiffs refer to as the "HII Marketing and Sales Enterprise": (1) Defendants; (2) Assurance; (3) Simple Health; (4) Nationwide; and (5) other third-party distributors.

86.     Whether Defendants have replaced Simple Health within the enterprise and whether the enterprise constitutes an ongoing organization, perpetuating the

fraudulent scheme is unknown. Nationwide has clearly taken on a more significant role within Defendants' marketing and distribution network since the FTC concluded its action against Simple Health. Also, Defendants continue to collect premiums resulting from the fraudulent scheme. Regardless, the HII Marketing and Sales Enterprise was a functioning organization for more than five years. The enterprise engaged in, and its activities affected, interstate commerce with fraudulent products being marketed and sold throughout the country as well as fees and premiums being collected from consumers throughout the country.

87.    While the Defendants participate in and are members and part of the HII Marketing and Sales Enterprise, and are a part of it, they also have an existence separate and distinct from the enterprise.

88.    Defendants needed a distribution and marketing system in order to market and sell their limited benefit indemnity plans at enormously inflated prices. The HII Marketing and Sales Enterprise provided this means. Defendants' control of and participation in the enterprise is necessary for the successful operation of their scheme. Defendants control and operate the enterprise in at least the following ways:

(a)    developing the products at the heart of the scheme;

(b)    developing the network and recruiting Assurance, Simple Health and Nationwide;

(c)     entering into an exclusive agreement in 2013 with Simple

Health for the promotion of HII products – primarily limited

benefit indemnity plans, medical discount plans and AD&D

insurance;

(d)     entering into a similar agreement with Nationwide in 2015;

(e)     paying Assurance, Simple Health and Nationwide very high

commissions;

(f)     funding the operation of Assurance, Simple Health and

Nationwide with advanced commissions which basically

constituted multi-million dollar loans;

(g)     jointly creating misleading "lead generation" websites;

(h)     providing an online platform for Assurance, Simple Health and

Nationwide to quote and sale HII products;

(i)     recruiting and training Assurance, Simple Health and

Nationwide sales agents;

(j)     allowing Assurance, Simple Health and Nationwide agents to

register their licenses through HII;

(k)     monitoring sales calls;

(l)     reviewing, editing, and approving fraudulent sales scripts;

(m)   acting as third party administrator, providing customer service after the sale including processing enrollment forms, verification of coverage, and providing documents to consumers;

(n)   collecting premiums;

(o)   accounting for premiums and commissions and distributing commissions to Assurance, Simple Health and Nationwide;

(p)   fielding consumer complaints; and

(q)   paying Simple Health's legal costs stemming from regulatory investigations.

## PREDICATE ACTS

89.   Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).  As set forth below, Defendants have engaged, and continue to engage, in conduct violating each of these laws to effectuate their scheme.

90.   In addition, in order to make their scheme effective, each of the Defendants sought to and did aid and abet the others' in violating the above laws within the meaning of 18 U.S.C. § 2.  As a result, their conduct is indictable under 18 U.S.C. §§ 1341 and 1343, on this additional basis.

## Violations of 18 U.S.C. §§ 1341 and 1343

91.   For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, in violation of 18 U.S.C. § 1341, placed and caused to be placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matters and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to membership cards and other confirmatory materials sent by Defendants to Plaintiffs and class members.

92.   For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire or caused to be transmitted and received by wire, matter and things which include but are not limited to misrepresentations and omissions on websites and during sales pitches over the phone. Wire transmissions were also used for the collection of information from the consumer and for the collection of fees and premiums.

93.   The misrepresentations, acts of concealment and failures to disclose of Defendants, Assurance, Simple Health and Nationwide were knowing and

intentional, and made for the purpose of deceiving Plaintiffs and the class and obtaining their property for Defendants' gain.

94.     Defendants were not only aware of the fraudulent scheme but were instrumental to the functioning of the scheme. Defendants recruited Simple Health and Nationwide and developed the network through which the products were fraudulently marketed; funding the operation of Assurance, Simple Health and Nationwide, jointly creating misleading "lead generation" websites, creating the platform through which Assurance, Simple Health and Nationwide quoted and sold HII products, recruiting and training Assurance, Simple Health and Nationwide sales agents, monitoring sales calls, reviewing, editing, and approving fraudulent sales scrips, acting as the third party administrator for products sold by Assurance, Simple Health and Nationwide, fielding multitudes of consumer complaints and even covering Simple Health's legal expenses for regulatory actions.

95.     Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and Plaintiffs and the class relied on the misrepresentations and omissions as set forth above.

96.     As a result, Defendants have obtained money and property belonging to the Plaintiffs and class members, and Plaintiffs and the class have been injured in their business or property by Defendants' overt acts of mail and wire fraud, and by their aiding and abetting each other's acts of mail and wire fraud.

## PATTERN OF RACKETEERING ACTIVITY

97.     Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past ten years.  In fact, each of the Defendants has committed, caused to be committed or aided and abetted in the commission of thousands of acts of racketeering activity.  Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and class members.

98.     The multiple acts of racketeering activity which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## RICO VIOLATIONS

### § 1962(C)

99.     Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity …"

100.   Through the patterns of racketeering activities outlined above, the Defendants have also conducted and participated in the affairs of the HII Marketing and Sales Enterprise.

## § 1962(D)

101.   Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b) or (c), of this section."

102.   Defendants' conspiracy to falsely obtain money from Plaintiffs and class members for their own use through the fraudulent scheme described above violates 18 U.S.C. §1962(d).

103.   Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the HII Marketing and Sales Enterprise through a pattern of racketeering activity comprised of numerous acts of mail fraud and wire fraud, and each Defendant so participated in violation of 18 U.S.C. § 1962(c).

## <u>CLASS ACTION ALLEGATIONS</u>

104.   Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(b)(3) as a class action on behalf of a nationwide class of persons defined as:

> All persons who, from May 5, 2016, to the date of certification purchased a health insurance plan from Defendants through Assurance, Simple Health or Nationwide.

(the "Class").

105.   Plaintiffs also bring this action on behalf of a nationwide subclass of

persons defined as:

> All persons who, from May 5, 2016, to the date of certification
> purchased a health insurance plant from Defendants through
> Assurance, Simple Health or Nationwide and incurred a medical
> expense that was not covered because the product was not a
> comprehensive health insurance plan.

(the "Medical Expense Subclass")

## RULE 23(A)

## TYPICALITY

106.   Plaintiffs and the members of the Class and the Subclass all have

tangible and legally protectable interests at stake in this action.

107.   The claims of the named class representatives and the absent class

members have a common origin and share a common basis. Their claims originate

from the same illegal, fraudulent, conspiratorial, and aiding and abetting practices

of Defendants, and Defendants act in the same way toward Plaintiffs and the

members of the class.  As such, each Plaintiff has been the victim of Defendants'

illegal practices because each has purchased one of Defendants' limited benefit

indemnity policies.

108.   Plaintiffs state claims for which relief can be granted that are typical of

the claims of absent Class members and Subclass members.  If brought and

prosecuted individually, the claims of each class member would necessarily require proof of the same material and substantive facts, rely upon same remedial theories, and seek the same relief.

109.   The claims and remedial theories pursued by the named class representatives are sufficiently aligned with the interests of absent class members to ensure that the universal claims of the Class and the Subclass will be prosecuted with diligence and care by Plaintiffs as representatives of the class.

## NUMEROSITY

110.   The members of the Class are so numerous that joinder of all members is impracticable.  According to the FTC, just Simple Health's involvement in the scheme "left tens of thousands of consumers who thought they had purchased comprehensive health insurance without such coverage." FTC *v. Simple Health Plans, LLC*, Complaint at ¶ 20.  The Class is, however, ascertainable as the names and addresses of all class members can be identified in business records maintained by the Defendants.

## COMMONALITY

111.   The questions of law and fact common to the class include, *inter alia:*

(a)     whether Defendants participated in conspired with regard to or aided and abetted a fraudulent scheme;

(b)     whether Defendants engaged in mail and wire fraud;

33

(c)     whether Defendants engaged in a pattern of racketeering activity;

(d)     whether the HII Marketing and Sales Enterprise constitutes an enterprise within the meaning of 18 U.S.C. § 1961 (4).

(e)     whether Defendants conducted or participated in the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

(f)     whether Defendants acts in violation of 18 U.S.C. § 1962 proximately caused injury to Plaintiffs and Class Members' business or property.

## ADEQUATE REPRESENTATION

112.   Plaintiffs are willing and prepared to serve the Court and proposed class in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the class and have no interests adverse to, or which directly and irrevocably conflict with, the interests of other members of the class.

113.   The self-interests of the named class representatives are co-extensive with and not antagonistic to those of the absent class members.  The proposed representatives will undertake to well and truly protect the interests of the absent class members.

114.   Plaintiffs have engaged the services of counsel indicated below.  Said counsel are experienced in complex class litigation, will adequately prosecute this action, and will assert, protect and otherwise well represent the named class representatives and absent class members.

## RULE 23(B)(2)

115.   The Defendants have acted or refused to act on grounds generally applicable to the class, making final declaratory or injunctive relief appropriate.

## RULE 23(B)(3)(2)

116.   The questions of law and fact common to members of the class predominate over any questions affecting only individual members.

117.   A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that individual claims by the class members are impractical as the costs of pursuit far exceed what any one Plaintiff or class member has at stake.

## COUNT I

## VIOLATION OF RICO 18 U.S.C. § 1962 (c)

118.   This claim for relief arises under 18 U.S.C. § 1964(c).

119.   Defendants have conducted or participated in the conducting the HII Marketing and Sales Enterprise through a pattern of racketeering activity.

120.   As a direct and proximate result, Plaintiffs and Class Members have been injured in their business or property by the predicate acts constituting the pattern of racketeering activity.

121.   Specifically, Plaintiffs and Class Members have been injured in their business or property by paying fees and premiums they would not have paid absent Defendants' illegal conduct. Plaintiffs and Subclass Members have also been injured in their business or property because they incurred unreimbursed medical expenses that would have been covered by comprehensive medical insurance.

122.   Accordingly, Defendants are liable to Plaintiffs and Class Members for three times their actual damages as proven at trial, plus interest and attorneys' fees

## COUNT II

### VIOLATION OF RICO 18 U.S.C. § 1962(D) BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962 (C)

123.   This claim for relief arises under 18 U.S.C. § 1964(c).

124.   In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above, conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the HII Marketing and Sales Enterprise through a pattern of racketeering.

125.   As a direct and proximate result, Plaintiffs and class members have been injured in their business or property by the predicate acts which make up the Defendants' patterns of racketeering.

126.    Specifically, Plaintiffs and Class Members have been injured in their business or property by paying fees and premiums they would not have paid absent Defendants' illegal conduct. Plaintiffs and Subclass Members have also been injured in their business or property because they incurred unreimbursed medical expenses that would have been covered by comprehensive medical insurance.

127.    Accordingly, Defendants are liable to Plaintiffs and Class Members for three times their actual damages as proven at trial, plus interest and attorneys' fees.

### COUNT III

### VIOLATION OF 18 U.S.C. § 2 BY
### SEEKING TO AND AIDING AND ABETTING IN THE VIOLATION OF 18
### U.S.C. § 1962 (C)

128.    This claim for relief arises under 18 U.S.C. § 1964(c).

129.    As set forth above, Defendants knowingly, and with shared intent, sought to, and have, aided and abetted Assurance, Simple Health and Nationwide in the commission of predicate acts, in engaging in a pattern of racketeering activity, and in violation 18 U.S.C. § 1962(c).

130.    Under 18 U.S.C. § 2, the RICO violations of Assurance, Simple Health and Nationwide are the violations of the Defendants as if they had been committed directly by them.

131.    As a direct and proximate result of Defendants aiding and abetting Assurance, Simple Health and Nationwide, Plaintiffs and class members have been

injured in their business or property by the predicate acts which make up the Defendants' patterns of racketeering.

132.   Specifically, Plaintiffs and Class Members have been injured in their business or property by paying fees and premiums they would not have paid absent Defendants' illegal conduct. Plaintiffs and Subclass Members have also been injured in their business or property because they incurred unreimbursed medical expenses that would have been covered by comprehensive medical insurance.

133.   Accordingly, Defendants are liable to Plaintiffs and Class Members for three times their actual damages as proven at trial, plus interest and attorneys' fees.

## COUNT IV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER 18 U.S.C. § 1964(A)

134.   This claim arises under 18 U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962, and under 28 U.S.C. § 2201 which authorizes associated declaratory relief.

135.   As set forth in Counts I and II above, Defendants have violated 18 U.S.C. §§ 1962(c) and (d), and will continue to do so in the future.

136.   Enjoining Defendants from committing these RICO violations in the future and/or declaring their invalidity is appropriate as Plaintiffs and Class Members have no adequate remedy at law, and will, as set forth above, suffer irreparable harm in the absence of the Court's declaratory and injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following relief:

(a)     Certification of the Class and Subclass pursuant to Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as the representatives of the Classes, and designating their counsel as counsel for the Classes;

(b)     A declaration that Defendants have committed the violations alleged herein;

(c)     Treble the amount of damages suffered by Plaintiffs and members of the Class and Subclass as proven at trial plus interest and attorneys' fees and expenses;

(d)     An injunction preventing Defendants from engaging in future fraudulent practices;

(e)     Costs of this action, including reasonable attorneys' fees and expenses; and

(f)     Any such other and further relief as this Court deems just and proper,

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 5, 2020

**JOHNSTONE CARROLL, LLC**

*/s/ F. Inge Johnstone*
F. INGE JOHNSTONE
MATTHEW F. CARROLL
2204 Lakeshore Drive
Suite 303
Homewood, AL  35209
Telephone: (205) 383-1809
Facsimile:  (888) 759-3882
Email:  ijohnstone@johnstonecarroll.com

**WHATLEY KALLAS, LLP**

*/s/ W. Tucker Brown*
JOE R. WHATLEY JR.
W. TUCKER BROWN
2001 Park Place North
1000 Park Place Tower
P.O. Box 10968
Birmingham, AL 35203
Telephone: (205) 488-1200
Facsimile:  (800) 922-4851
E-mail: jwhatley@whatleykallas.com
            tbrown@whatleykallas.com

Patrick J. Sheehan
101 Federal Street, 19th Floor
Boston, MA  02110
Telephone:  (617) 573-5118
Facsimile:  (617) 371-2950
Email:  psheehan@whatleykallas.com


*Attorneys for Plaintiffs*